UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURA FROST, individually, as Independent Administrator of the Estate of GLENN BROWN, deceased, ) ) ) ) | |
| ) | Case No. 18-cv-03505 |
| Plaintiff, ) ) | Judge Sharon Johnson Coleman |
| v. ) ) | |
| SHERIDAN CORRECTIONAL CENTER STAFF MEDICAL DIRECTOR ROBIN ROSE, et al., ) ) ) ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Laura Frost, as independent administrator of the Estate of Glenn Brown ("Brown")[1], brings this suit against Sheridan Correctional Center ("Sheridan") Staff Medical Director Robin Rose, Nurse Heidi M. Demes (née Rich), Nurse Jana Havrilla (née Haula), Nurse Laura McQueen, Nurse Teresa Tangman (née Arroyo), Nurse Jeanette Benckendoff, Correctional Officer ("C.O.") Damien Krieser, C.O. Anne Anderson, C.O. Israel Corona, C.O. Dana Richardson, Internal Affairs Officer Kevin Stiles, Counselor Melinda Martinez, Counselor Nick J. Crisman, and Chief Administrative Officer David J. Gomez, (collectively, the "Illinois Department of Corrections ["IDOC"] defendants"), Nurse Annette, Nurse Mickey, Nurse K. Phelps, C.O. Baker, Internal Affairs Officer Sheriaan, AWP S. Konopka, and all other unknown IDOC defendants, as well as Dr. Marshall E. James and Dr. He Yuan. Brown maintains Rose and the nursing staff, alongside Dr.

---

[1] Brown originally brought the suit on his own behalf, but he passed away in late 2021, five years after the at-issue events. Thus, this case is now brought by the administrator of his estate, Laura Frost. The Court will nonetheless refer to plaintiff as Brown, given that this case surrounds actions involving his treatment while incarcerated.

1

James and Dr. Yuan, failed to provide him with adequate nutrition and medical care in violation of 42 U.S.C. § 1983. He contends that other IDOC defendants engaged in a conspiracy to deprive him of his due process rights, and that IDOC defendants retaliated against him in violation of the First Amendment. Lastly, he brings an intentional infliction of emotional distress claim against the IDOC defendants. Before the Court are two summary judgment motions: one brought by the IDOC defendants, and another brought by Dr. James and Dr. Yuan. For the following reasons, the Court grants both motions in their entirety [138] [142].[2]

**Preliminary Matters**

Before diving into the facts, the Court must address some preliminary evidentiary matters. Defendants' summary judgment reply briefs focus on two deficiencies in Brown's Rule 56.1 fact statements. First, defendants maintain that Brown has "admitted" most of the defendants' submitted statements of fact because he failed to properly cite to the record when disputing a fact. The Northern District of Illinois Local Rules provide that all material facts set forth in the moving party's statement are deemed admitted unless controverted by the opposing party through citing "specific evidentiary material." N.D. Ill. Local Rule 56.1; *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Here, Brown often fails to cite to any portion to the record when disputing defendants' facts. "Mere disagreement with the opponent's factual statement is inadequate unless made with appropriate citation to the record." *Crowder v. Barrett*, No. 17 C 0381, 2022 WL 864519, at *2 (N.D. Ill. Mar. 23, 2022) (Blakey, J.). Thus, the Court finds certain defendants' material facts "admitted" and includes them the below discussion, so long as they are supported by the record.

---

[2] Brown misidentified several of the aforementioned defendants in his complaint. To the extent the defendants have provided their full names, the Court has included them here; otherwise, defendants are identified by how they are named in the Second Amended Complaint (Dkt. 129.) Several defendants are not represented in this case or did not file a summary judgment motion. The Court finds the logic in this Opinion extends to all named defendants. The Court gives Brown two weeks to provide a brief justifying why summary judgment is inappropriate as to these other defendants; otherwise, the Court will grant judgment for all defendants. *See* Fed. R. Civ. P. 56(f).

Second, defendants ask this Court to strike any of Brown's additional statements of fact that are supported by his purported diary entries. Defendants argue that these entries are inadmissible evidence and should not be considered by the Court. "Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Opposition to a summary judgment motion cannot be based on inadmissible hearsay. *Id.* The Court afforded Brown the opportunity to file a surreply to address defendants' concerns, but no surreply was filed.

The Court finds that the diary entries are inadmissible hearsay. Evidence is inadmissible hearsay if offered for the truth of the matter asserted and not otherwise admissible under the rules or federal statutes. *See* Fed. R. Evid. 801–02. Here, these notes are offered for their truth. *See, e.g., Collins v. Kibort*, 143 F.3d 331, 338 (7th Cir. 1998) (discussing how diary entries, submitted to "prove that the events reported therein actually occurred," are hearsay). Although given the opportunity, Brown did not provide the Court with any explanation for why the entries should be introduced under other rules of evidence, and the Court does not see one. Thus, to the extent Brown relies on statements of fact that solely cite to his diary, the Court will not consider them. Because the Court rules on this basis, it does not consider whether the diary entries were properly authenticated.

Lastly, Dr. Yuan and Dr. James argue that several facts should be stricken as immaterial. The Court does not strike the facts but will not consider them to the extent they are indeed immaterial to the action.

**Background**

On July 12, 2016, Brown was attacked by his cellmate while incarcerated at Sheridan. His cellmate had previously been involved in a fight at the prison. C.O. Kreiser was the first to arrive at the cell, and C.O. Anderson arrived shortly thereafter. There is a dispute as to the officers' actions and how quickly they stopped the fight. C.O. Anderson and C.O. Corona picked Brown off the

floor after the fight and took Brown to the healthcare unit for treatment. He was transferred to St. Anthony's Medical Center that day. After an examination, doctors determined Brown suffered several facial fractures, requiring various surgeries. As a result, he needed six weeks of fixation wiring and a full liquid diet with nutritional supplements. At the end of July, Brown was discharged to Sheridan, and his medical records noted that St. Anthony's staff requested that Brown's "needs are met for full liquid diet, supplements, eye drops mouth wash etc." (Dkt. 161-9, Ex. 8, Brown000083). His discharge was delayed a day or two because Sheridan did not have pain medication (Norco) in stock and because Brown suffered a severe nosebleed.

During the relevant time frame, Dr. Marshall James was Sheridan's Medical Director. Dr. James prescribed and ordered medications and dietary items. The nursing staff handled distributing medications and orders. Nurse Robin Rose was the Health Care Unit Administrator and was responsible for managing the health care unit.

Upon Brown's return, he stayed in Sheridan's infirmary. At his first examination, Dr. James reported his closed facial fractures but noted he was stable. (Dkt. 161-13, Ex. 9, IDOC000252.)[3] Dr. James provided Brown with various medications and added an order for a Boost nutrition supplement. However, Brown did not get this supplement immediately, as Dr. James told a nurse he did not think the Boost supplement was needed at this time. (*Id*, IDOC000260–61.) On July 29, Brown again saw Dr. James, who ordered a prescription for Norco. The next day, Brown reported to a nurse that he only was eating chicken broth, and Dr. James prescribed Boost at mealtimes. (*Id.*, IDOC000262.) The parties dispute whether he was given Boost at mealtimes before and after this

---

[3] The Court notes that the parties submitted plentiful exhibits with cites to corresponding Bates numbers. But when the Court referenced the underlying record, it noticed that Exhibit No. 9 contained two different versions of documents with identical bates numbers. The Court advises the parties to be more careful with their record numbering in the future, as it made review more difficult and time consuming for the Court, just as the Court is sure it did for the parties.

4

time, and upon its review of the record, the Court notes that Brown received Boost, although it is unclear if he received it consistently.

As of August 1, Dr. James noted that Brown's facial bruising, although persistent, was improving. He also noted he would check with dietary about a full liquid diet but included in his medical records that Brown had requested a "soft . . . diet." (*Id.*, IDOC000266.) On August 3, Dr. James again examined Brown, and noted that he had bruising but was able to open his lips. Dr. James also noted numbness in Brown's arm and added a prescription for Brown to take Norco in the morning. Two days later, Dr. James examined Brown and noted he had bruising and pain, ordering that Brown continue to be monitored. Brown testified in his deposition that he did not receive medications, but Brown's medical records show that he was frequently visited by nurses who provided him with pain medication, particularly Norco and Tramadol.

On August 8, 2016, Brown saw Dr. James again and requested more food. Noting that Brown had decreased bruising and was stable, Dr. James ordered an increase in his diet and that Brown continue to be monitored. Two days later, Dr. James again examined Brown, noting his stable condition and Brown's request for more food, particularly at breakfast. Dr. James ordered nursing to check with IDOC regarding Brown's food. Brown testified in his deposition that during this time, he was not given food that he was able to eat. (Dkt. 161-1, 89:9–14.) On August 12, Dr. James again met with Brown, who complained of insufficient food. Dr. James directed Nurse Robin to consult with the nutrition department about providing Brown with increased food portions. Three days later, Dr. James examined Brown again, noting the significant improvement in his swelling and bruising. He ordered a renewal of Tramodol, a check with dietary to provide increased food, and that Brown continued to be monitored.

On August 17, 2016, Brown again complained of not receiving enough food and facial pain. Dr. James decreased his Norco prescription, noting he had an orthopedic consult scheduled for the

5

next day. When Brown saw Dr. James two days later, Dr. James noted Brown was receiving his increased food and had no notable bruising. As of August 22, 2016, Brown was on a soft diet, which Dr. James continued to order for Brown. The nurses maintain that Brown complained about the food being served: one note reads that Brown explained "this cup is supposed to be tomato soup but it is spaghetti sauce, and this is apple sauce, which I've had for at least 4-6 meals. The doctor changed my diet, I need different food." (Dkt. 140-1, Ex. 1, IDOC000247.)

On August 24, when Brown next saw Dr. James, Brown had no new complaints. Five days later, Brown again complained of inadequate nutrition and that he disliked his soft meals. The next day, Brown told Dr. James that he had complaints about the food. He ordered that Nurse Robin check on his diet needs. On August 31, the wiring in Brown's jaw was removed.

On September 1, 2016, Dr. James approved Brown for discharge from the infirmary, upon which he was ordered to continue his medication, continue two more weeks of a soft diet, have a follow-up with the offsite surgeon, and a follow-up with Dr. James. At this point, Brown no longer took the Boost supplement. Two weeks later, Brown had a follow up with Dr. James, where Dr. James noted his condition had improved and decreased his Norco prescription.

In early October, Brown had another follow-up with Dr. James. During this and later follow-ups, other medical conditions (like hypothyroidism and diplopia) were identified and treated. Towards the end of the month, Dr. James saw Brown for another follow up, where Brown reported chronic discomfort in his left shoulder and hip from the incident. Dr. James diagnosed Brown with chronic muscle strain. It is unclear if Brown was referred to a specialist for this issue. Brown filed a grievance[4] in October that he was provided improper medication and that "Dr. James calls him a liar." (Dkt. 161-4, Ex. 4, BROWN002130.) Brown contended that Nurse Rose ignored his

---

[4] Brown provided an exhibit showing the names of counselors who handled grievances, but contrary to Brown's contentions, these do not indicate that grievances went missing.

complaint. At the beginning of November, Dr. James adjusted Brown's medications and prescribed an analgesic balm for his muscle pain.

In early January 2017, Brown submitted a grievance for pain, numbness, and double vision. Nurse Rose ultimately deemed that the request had no merit because he saw the medical team, although she again placed him on the medical line. (Dkt. 161-20, Ex. 16, IDOC00025–27.) Warden Gomez signed off on this grievance. Brown submitted a follow up grievance on these issues and remarked that he did not receive pain medication for his shoulder issues until late January. Furthermore, Brown lamented that he was ordered to see an ophthalmologist and neurologist, but was never seen by one—yet, the record indicates that he was seen by an ophthalmologist.

During the above time-period, Brown also saw Dr. Yuan, a board-certified psychiatrist for mental health treatment. Dr. Yuan was not involved in treating Brown's physical injuries after the incident, nor in ordering food or pain medication. On August 10, Dr. Yuan had a psychiatric visit with Brown where Brown mentioned his attack, and Dr. Yuan increased his order for Zoloft (for depression) and continued his prescription for trazodone (for depression) and buspar (for anxiety). On August 30, Brown had a visit with another treatment provider, where he reported his nervousness about having a cellmate. Dr. Yuan had additional psychiatric visits with Brown in September and November. Brown referenced several other appointments where he expressed concerns with medication management, how "the IDOC works", as well that he was "targeted by an officer", but these appointments were not with Dr. Yuan. (Dkt. 161-18, Ex. 14, BROWN001769; BROWN001753.)

In his deposition, he explained that before he was released, he requested a "crisis team" because he was being harassed by the officers for submitting grievances. Brown was discharged from IDOC on February 22, 2017.

**Legal Standard**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal citations omitted). In determining whether a genuine issue of material fact exists, this Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, "[m]erely alleging a factual dispute cannot defeat the summary judgment motion." *Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**Discussion**

Brown maintains he was provided with constitutionally deficient treatment during his time at Sheridan. He also brings an intentional infliction of emotional distress claim against defendants. Furthermore, he maintains that defendants' conduct surrounding the grievance process evinces a conspiracy to deprive him of his due process rights and constitutes first amendment retaliation.[5] The Court will address each claim in turn.

**Brown's Deliberate Indifference Claim**

Brown's deliberate indifference claim against Dr. James and Dr. Yuan, as well as against the IDOC healthcare providers, stems from his belief that he was not provided with adequate food, medication, or care upon his return to Sheridan in late July 2016.

---

[5] From the Court's review, the Second Amended complaint appears to state a first amendment retaliation claim. In the briefing, both parties treat it as a conspiracy claim. Thus, the Court considers whether the parties engaged in a conspiracy and does not assess whether there is a viable first amendment claim.

8

"Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016) (internal citation omitted). To succeed on a deliberate indifference claim, a plaintiff must satisfy both the objective and subjective elements of the claim. *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The objective element is met when the plaintiff shows that he faced a serious medical need or deprivation of "the minimal civilized measure of life's necessities." *Id.* (internal citations omitted).

Brown first claims that the objective prong is satisfied because Dr. James and the medical team deprived him adequate nutrition. He argues that Dr. James and the nursing staff withheld him the necessary nutrients—including his Boost supplement—which he needed post-surgery. Deprivation of food can meet the objective element of a deliberate indifference claim depending on the "amount and duration of the deprivation." *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999). The IDOC defendants refute Brown's claim, arguing that Brown repeatedly maintained that he simply did not like the food he was provided, nor that he was provided inadequate food. While there is some evidence that Brown expressed displeasure about the food he received, the evidence also suggests that Brown told staff that he had not received enough food. For instance, he remarked that he only ate chicken broth—a jury could infer that this was more than a mere complaint about the quality of food provided.

Nevertheless, the overall record does not suggest that Brown was deprived of food in a manner that would reach a constitutional violation. Brown received food, and when he expressed his concerns to staff about the potential inadequacy of his diet, Dr. James followed up on those requests to address Brown's dietary needs. Brown's argument that he "received food items that he could not eat, for every meal" is simply not supported by the record. Furthermore, since Dr. James responded to his complaints, even if the objective element was met, the subjective element is not

9

because Dr. James clearly did not disregard the risk. Thus, to the extent Brown's claim hinges on deprivation of food, the Court finds a jury would not reasonably find a constitutional violation based on these claims.

Brown alternatively brings a deliberate indifference claim based upon what he contends was defendants' total disregard for his pain. The Court agrees that his physical condition post-attack constituted a serious medical need, satisfying the first prong. Thus, to bring a claim on this front, Brown needed to show that defendants "knew of a serious risk to the prisoner's health and consciously disregarded that risk." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). Dr. James and the medical staff must make a decision "that is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person actually did not base the decision on such a judgment." *Id.* (internal citation omitted). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008).

As the above summary illustrates, Dr. James repeatedly provided Brown with care upon his return from Sheridan and for months thereafter. *See Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (discussing how the continued course of treatment defeated plaintiff's deliberate indifference claim). Brown maintains that this Court cannot make a summary judgment determination at this stage because doing so requires this Court to make credibility determinations about the evidence. *See Rowlands v. United Postal Service – Fort Wayne*, 901 F.3d 792, 798 (7th Cir. 2018). The Court finds no credibility determination is necessary because Brown's unsupported protests do not create a dispute regarding whether Dr. James adequately addressed his pain.

Deliberate indifference is "a synonym for intentional or criminally reckless conduct." *Salazar v. City of Chi.*, 940 F.2d 233, 238 (7th Cir. 1991). The Court sees no viable dispute of fact that

suggests Dr. James engaged in this level of egregious conduct, nor evidence demonstrating that he deviated from a reasonable course of treatment. Brown was repeatedly provided with pain medication upon release, and his later complaints of shoulder pain were also treated, first with analgesic balm and later with pain medication. Brown argues that Dr. James delayed responding to his complaints of pain. *See, e.g., Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (discussing how delay in providing medication can constitute a deliberate indifference claim). But Brown was provided with medical treatment in response to his medical complaints and has not pointed to any admissible evidence that shows that Dr. James ignored his complaints. Furthermore, Brown has not demonstrated how any delay led to a detrimental effect. *Langston v. Peters*, 100 F.3d 1235, 1240–41 (7th Cir. 1996). Thus, the Court grants summary judgment for Dr. James.

As for the IDOC defendants, Brown could not recall the relevant officials and how they acted during his deposition. From reviewing the parties' fact statements, the Court could only identify the actions of Nurse Rose. Brown argues that she was aware of his pain and need for an increased diet through his grievances and Dr. James's orders, but ignored them. First, Brown has not pointed to record support that Nurse Rose failed to address his nutritional concerns. Second, although his grievance indicates his frustration with having not received medical care, Brown has not shown that the medical care provided was constitutionally deficient or that his complaints were ignored. For instance, in the grievance, Nurse Rose put him back on the line to receive medical care. A jury could not reasonably find that this conduct amounts to deliberate indifference, as it again reiterates that the medical staff provided Brown with medical attention.

In addition, the Court notes that Brown testified in his deposition that pain medication was withheld from him while in the infirmary (Dkt. 161-1, 70:2–4), and that his medical records conflict with this testimony. However, this dispute of fact does not defeat summary judgment. Brown did not identify who allegedly withheld the medication, and thus the Court finds a jury would not be

11

able to find that any IDOC defendant acted with deliberate indifference to Brown's medical care. All told, this case is simply not one that "approach[es] a total unconcern for [Brown's] welfare in the face of serious risks." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (internal citations omitted). Thus, the IDOC defendants are also entitled to summary judgment on this claim.

Brown also brought this deliberate claim against Dr. Yuan, arguing that he was aware of the above medical deficiencies but failed to take any action. But Dr. Yuan, a mental health provider, was not responsible for Brown's medical care for his physical injuries. Brown has not shown that Dr. Yuan is personally liable for any of the above treatment, as is required to maintain a case against a medical care provider. *See Payne v. Churchich*, 161 F.3d 1030, 1039 (7th Cir. 1998). Nor does Brown point to any deficient treatment in the care Dr. Yuan provided. Thus, the Court grants summary judgment for Dr. Yuan as well.

**Brown's Intentional Infliction of Emotional Distress ("IIED") Claim**

Brown's IIED claim against the IDOC defendants fails as well. To bring this claim, Brown must establish that defendants' conduct was truly extreme and outrageous, "so extreme as to go beyond all possible bounds of decency." *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017) (internal citation omitted). Brown's claim stems from defendants' failure to stop the assault, to provide food and medication, and to investigate his grievances. But Brown has not pointed to any admissible evidence that supports a level of egregious conduct. Thus, the Court grants summary judgment to the IDOC defendants on this claim. As a result, the Court need not consider defendants' sovereign immunity argument.

**Brown's Conspiracy Claims**

Brown has also failed to establish that the IDOC defendants engaged in a conspiracy to deprive him of his due process and first amendment rights; specifically, his right to pursue his grievances. A conspiracy requires some showing of a mutual agreement or understanding to violate

the individual's constitutional rights. *See, e.g., House v. Belford*, 956 F.2d 711, 721 (7th Cir. 1992). Nothing here suggests any such agreement between the IDOC defendants. Indeed, Brown argues that the *lack* of investigation into his lack of treatment suggests coordinated action, but does not provide any legal support for this argument. The record is scarce as to the grievance process, but nothing provided could lead a jury to infer there was an agreement. Furthermore, there is no evidence indicating that the officials threw away his grievances or that they stonewalled his efforts to address his concerns. The Court grants summary judgment to the IDOC defendants on this claim as well.

**Conclusion**

For the above reasons, the Court grants defendants' motions for summary judgment. Because all claims against defendants are dismissed, the punitive damages claim is dismissed as well. The Court recognizes that Brown must have faced severe pain from the July 12 incident. Nonetheless, there is no genuine dispute of material fact that justifies this Court sending this Case to a jury.

IT IS SO ORDERED.

Date: 9/11/2023  Entered:_____
SHARON JOHNSON COLEMAN
United States District Judge